**In re FRANKLIN NATIONAL BANK SECURITIES LITIGATION.**

**MDL No. 196(JBW).**

United States District Court,
E. D. New York.

Aug. 17, 1979.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for trustee by William O. Purcell, New York City, of counsel.

Casey, Lane & Mittendorf, New York City, for F.D.I.C. by William E. Kelly, John T. Morin, Edward C. Cerny, III, James M. Shaugnessy, Gerald E. Singleton, New York City, of counsel.

Joan M. Bernott, James P. Klapps, Gerald Smolin, Jr., M. Faith Burton, U.S. Dept. of Justice, Washington, D.C., L. Robert Griffin for the Office of the Comptroller of the Currency, Washington, D.C., John Harry Jorgenson, Washington, D.C., for Board of Governors of the Federal Reserve System.

Donald Ringsmuth, Bradley K. Sabel, New York City, for Federal Reserve Bank of New York.

Rivkin, Leff & Sherman, Garden City, N.Y., for National Surety & Fire by Leonard Rivken, Jeffrey Silberfeld, Garden City, N.Y., of counsel.

Davis, Polk & Wardwell, New York City, for Ernst & Ernst by Daniel Kolb, Bartlett H. McGuire, Howard A. Ellins, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Aetna by Mark A. Belnick, New York City, of counsel.

Kelley, Drye & Warren, New York City, for Continental Bank International by John M. Callagy, John P. Marshall, New York City, of counsel.

Shea, Gould, Climenko & Casey, New York City, for I.N.A. by Ronald H. Alenstein, Robert J. Hawley, New York City, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for Tisch by Kenneth B. Forrest, Elizabeth Sabin, New York City, of counsel.

Chadbourne, Park, Whiteside & Wolff, New York City, for Beisler, Hogan, et al. by Bernard W. McCarthy, New York City, of counsel.

Mudge, Rose, Guthrie & Alexander, New York City, for Sindona by John Kirby, New York City.

Poletti, Freidin, Prashker, Feldman & Gartner, New York City, for Crosse by Barbara A. Lee, Nicholas R. Weiskopf, New York City, of counsel.

Dewey, Ballentine, Bushby, Palmer & Wood, New York City, for Gleason, Lewis, Merkin and Smith by Michael D. DiGiacomo, New York City, of counsel.

## MEMORANDUM

WEINSTEIN, District Judge:

The United States moves for summary judgment against all the third party claims which allege that the regulation of Franklin National Bank (FNB) by the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), the Federal Reserve Bank (FRB) and the Federal Reserve Bank of New York (FRBNY) makes the United States liable for some of the losses arising from the decline and ultimate demise of FNB. Despite the cogent arguments in favor of this motion, pragmatic considerations, arising from the complex posture of this multidistrict litigation, demand that the motion be denied at this time, with leave to renew should pre-trial conditions change.

### I. Posture of Litigation

The numerous claims for relief now before us seek to fix responsibility for the financial collapse of FNB. *See Generally In re Franklin National Bank Securities Litigation*, 478 F.Supp. 577, MDL 196 (E.D.N.Y.1979); *In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723 (E.D.N.Y.1978); *In re Franklin Nat'l Bank Securities Litigation*, 73 F.R.D. 25 (E.D.N.Y. 1976). Both the FDIC, in its corporate capacity as receiver of FNB, and the Trustee in Bankruptcy of Franklin New York Corporation (FNYC), the parent holding company of FNB, have filed suit seeking recovery on the various Bankers Blanket Bonds that insured both FNB and FNYC against any loss through dishonest or fraudulent acts by employees of either corporation. *See Federal Deposit Insurance Corp. v. National Surety Corp.*, 425 F.Supp. 200 (E.D.N.Y.1977). The FDIC and the Trustee have also sued directly various officers and directors of FNB and FNYC. Finally, both the FDIC and the Trustee have filed complaints against Ernst & Ernst, the auditors of FNB and FNYC, alleging negligence in the audits. Overlapping claims have been made by a class of securities holders of FNYC. *See In re Franklin National Bank*, 381 F.Supp. 1390 (E.D.N.Y.

1974), *aff'd. in part, rev'd. in part, rem'd.*, 574 F.2d 662 (2d Cir. 1978), *clarified*, 599 F.2d 1109 (2d Cir. 1979). The FDIC alone has sued Continental Bank International (CBI) alleging that when FNB was considering hiring Donald Emrich, a former employee of CBI, and allegedly a prominent figure in the subsequent dishonesty at FNB, CBI misrepresented Emrich's record and character.

Extensive criminal charges have been brought against directors and officers of FNB and FNYC. Some have resulted in guilty pleas, some in jury verdicts of guilty, now on appeal, and some have not yet been tried. Almost all of the criminal defendants have pleaded the Fifth Amendment in this civil litigation, thus substantially inhibiting discovery. Nevertheless, pretrial practice has been vigorous, with some 100,000 pages of depositions, millions of documents and scores of motions, requiring many thousands of pages of briefs and supporting exhibits.

The issues now before us concern the third party claims filed by the primary defendants—the Bonding Companies, Ernst & Ernst, CBI and several of the officers and directors—against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, alleging, under a variety of legal and factual theories, that the regulatory supervision of FNB by the OCC, FDIC, FRB and FRBNY makes the United States liable for some of the losses suffered by FNB. These third party plaintiffs seek indemnification or contribution for any judgment against them in the primary actions.

While each of the governmental agencies is independent, they, quite properly, cooperated closely in the period before and after bankruptcy and receivership in carrying out banking and other fiscal policies of the country. The relationship among officials has been close on both an informal and formal basis. For example, the Comptroller of the Currency, charged with, among other things, bank examinations, is one of the triumvirate supervising the FDIC which insured deposits and now acts as receiver of FNB's assets, being itself the defunct bank's largest creditor.

II. *Possible Bases for a Cause of Action*

The Federal Tort Claims Act partially waives the sovereign immunity of the Unites States, permitting suit

. . . for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). This provision has never been interpreted to create any new causes of action (claims for relief) against the United States, but rather to confer only a procedural remedy. *See, e. g., Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Certain Underwriters at Lloyds*, 511 F.2d 159 (5th Cir. 1975); *Kaufman v. Evans*, No. 127–71 (D.N.J. July 21, 1977). State law defines the possible causes of action. *See, e. g., First State Bank of Hudson County v. The United States of America*, 599 F.2d 558 (3rd Cir. 1979); *Harmsen v. Smith*, 586 F.2d 156 (9th Cir. 1978); *Birnbaum v. U. S.*, 436 F.Supp. 967, 976 ff. (E.D.N.Y.1977), aff'd, 588 F.2d 319 (2d Cir. 1978). *But cf.* Davis, Administrative Law, § 25.08–2 at 566 (Supp.1976) (arguing that the Supreme Court has occasionally neglected this statutory requirement).

The third party plaintiffs, arguing under the basic New York principles of contribution and indemnity, N.Y.C.P.L.R. § 1401; *see, e. g., Bay Ridge Air Rights Inc. v. State*, 44 N.Y.2d 49, 404 N.Y.S.2d 73, 375 N.E.2d 29 (1978); *Klinger v. Dudley*, 41 N.Y.2d 362, 393 N.Y.S.2d 323, 361 N.E.2d 974 (1977); *North Colonie Central School Dist. v. McFarland Const. Co., Inc.*, 60 A.D.2d 685, 399 N.Y.S.2d 933 (1977), contend that an action for contribution or indemnity is possible here because the regulatory agencies named as third party defendants owed an actionable duty to FNB and its shareholders. *Cf. First State Bank of Hudson County v. The United States of America*, 599 F.2d 558 (3rd Cir. 1979); *Harmsen v. Smith*, 586 F.2d 156 (9th Cir. 1978); *Social Security Admin. Baltimore F.C.U. v. United States*, 138 F.Supp. 639 (D.Md.1956) (identical claims raised under law of New Jersey, California and Maryland). *See also United States v. Yellow Cab Co.*, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951). Two primary theories are offered to justify finding such a duty: (i) a duty should be implied from the statutory obligations imposed upon these regulatory agencies, *see, e. g., Runkel v. City of New York*, 282 A.D. 173, 123 N.Y.S.2d 485 (1953), and (ii) a duty should be found to have been spontaneously generated by any or all of the specific actions taken by those agencies in their supervision of FNB—essentially a theory of assumption of duty. *See, e. g., Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922); *Zibbon v. Town of Cheetowaga*, 51 A.D.2d 448, 382 N.Y.S.2d 152 (4th Dept.), *appeal dismissed*, 39 N.Y.2d 1056, 387 N.Y. S.2d 428, 355 N.E.2d 388 (1976); *Paul v. Staten Island Edison Corporation*, 2 A.D.2d 311, 155 N.Y.S.2d 427 (2d Dept. 1956). Neither contention is convincing.

A. *Implying a Duty from the Bank Regulation Statutes*

The third party plaintiffs first argue that the broad statutory schemes governing these bank regulatory agencies, *see, e. g.*, Federal Reserve Act, 12 U.S.C. § 221 *et seq.*; Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.*; National Bank Act, 12 U.S.C. § 21 *et seq.*, should provide a basis for implying a duty of care, running from those agencies to the banks and their shareholders, and that the failure of those agencies either to detect the weakness or alleged dishonesty at FNB, or to take appropriate regulatory action to remedy those problems, should be held a breach of that duty, and thus a basis for liability.

Similar claims have been raised in the litigations concerning other bank failures. So far no court has held that any of the statutory provisions governing the OCC, the FRB or the FDIC create any actionable duty running to the regulated institutions. *See, e. g., First National Bank of Hudson*

*County v. The United States of America*, 599 F.2d 558 (3d Cir. 1979); *Harmsen v. Smith*, 586 F.2d 156 (9th Cir. 1978), *affirming*, No. Civ. 73–450E (S.D.Cal. July 28, 1975); *Kaufman v. Evans*, No. 127–71 (D.N.J. July 21, 1977). *Cf. Social Security Admin. Baltimore F.C.U. v. United States*, 138 F.Supp. 639 (D.Md.1958) (same conclusion regarding the regulatory provisions of the Federal Credit Union Act, 12 U.S.C. § 1751 *et seq.*).

■ The provision most frequently analyzed in these earlier cases has been that requiring the OCC to conduct examinations of every national bank. 12 U.S.C. § 481. The courts have uniformly concluded that the Comptroller's primary duty is to supervise the banking system for the protection of the public and the national economy as a whole—and not for the protection of an individual banking institution. The purpose of national banking examinations under section 481 is to collect the information necessary to perform this broader regulatory function. *See, e. g., Harmsen v. Smith*, 586 F.2d 156, 157 (9th Cir. 1978); *Kaufman v. Evans*, No. 127–71, 5–6, (D.N.J. July 21, 1977). *See also* Senate Doc. No. 123, Pt. 2 at page 901, 82nd Cong., 2d Sess. (1952) (statement of Comptroller of the Treasury before the Joint Committee of the Economic Report) ("the chief duty of the national bank examiner is to ascertain that the statutory requirements and restrictions enacted by Congress and administrative regulations adopted thereunder are being complied with and that the lending and investment policies of the bank, and its operating procedures, are such as to minimize the dangers to the banking system"). The examinations are not conducted as a service to the banks: "Although bank examinations may reveal irregularities and even fraud, which discoveries may redound to the benefit of innocent persons, including stockholders, that result is merely an incidental benefit to the examined banks. . . ." *Harmsen v. Smith*, 586 F.2d 156, 157 (9th Cir. 1978). *Cf. Social Security Admin. Baltimore F.C.U. v. United States*, 138 F.Supp. 639, 646 (D.Md.1956) ("The detection of fraud is not a primary function of the examinations."). This analysis has led every court addressing the issue to conclude that the Comptroller's mandate to conduct national bank examinations does not create an actionable duty running to the examined bank; the Comptroller's failure to detect weakness or dishonesty at an examined bank gives rise to no cause of action against the United States under the Federal Tort Claims Act. *See, e. g., Harmsen v. Smith*, 586 F.2d 156 (9th Cir. 1978); *In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723 (E.D.N.Y.1978); *Kaufman v. Evans*, No. 127–71 (D.N.J. July 21, 1977).

■ Plaintiffs have fared no better in attempting to imply a duty from the statutory provision granting the FDIC power to examine insured banks. 12 U.S.C. § 1820(b). Again, courts have held that the primary purpose of the examination is not to protect the individual banking institutions. In the case of FDIC examinations, the fundamental purpose is to safeguard the insurance fund: "The purpose of the bank examinations by the FDIC under 12 U.S.C. § 1820(b) is to prevent losses that would result in claims against the insurance fund. . . . If bank examinations by the FDIC reveal any irregularities or fraud, such examinations, though they may inure incidentally to the benefit of a bank, are intended primarily for the protection of the insurance fund." *First State Bank of Hudson County v. The United States of America*, 599 F.2d 558 (3d Cir. 1979). *See also* S.Rep.No.1821, 86th Cong., 2d Sess. (1960) *reprinted in* [1960] U.S.Code Cong. & Admin.News pp. 3234, 3236 (discussing amendments to the Federal Deposit Insurance Act) (the FDIC's "supervisory responsibilities relate to specific types of actions which have a direct bearing upon its role as insurer"). This interpretation of the purpose of FDIC bank examinations has convinced courts that the statutory provision authorizing those examinations creates no duty to the examined bank, or to its shareholders or depositors; the failure of the FDIC to discover fraud or weakness, or even to disclose such adverse information if it is discovered, does not establish a claim for relief against

the United States. *See First State Bank of Hudson County v. The United States of America*, 599 F.2d 558 (3d Cir. 1979); *Federal Deposit Ins. Corp. v. Am. Bank Trust Shares*, 460 F.Supp. 549 (D.S.C.1978); *Davis v. Federal Deposit Insurance Corporation*, 369 F.Supp. 277 (D.Colo.1974).

■ The third party plaintiffs here have offered no persuasive argument why this consistent line of authority refusing to imply a duty from statutory provisions authorizing bank examinations should not also apply to the numerous other statutory provisions granting regulatory powers to the OCC, the FDIC, the FRB and the FRBNY. At an earlier point in this litigation, the District Judge to whom this case was previously assigned held that the bank "regulatory scheme does not create a duty to the banks regulated and any purported failure on the part of the United States to properly regulate the FNB cannot serve as the basis [of a claim for relief]." *In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723, 731 (E.D.N.Y.1978). We now reaffirm that conclusion. Neither the OCC, the FDIC, the FRB or the FRBNY can be held liable for their alleged failure to discern the alleged dishonesty and structural weakness at FNB, or for their alleged failure to take effective action to remedy those problems. *Cf. Birnbaum v. United States*, 588 F.2d 319 (2d Cir. 1978); *Zabala Clemente v. United States*, 567 F.2d 1140 (1st Cir. 1978); *Davis v. United States*, 536 F.2d 758 (8th Cir. 1976), *affirming*, 395 F.Supp. 793 (D.Neb.1975); *George Byers Sons Inc. v. East Europe Import Export Inc.*, 463 F.Supp. 135 (D.Md.1979) (suggesting the more extreme position that such an implied duty can never be the basis for a cause of action under the Federal Tort Claims Act).

This conclusion is not undercut by the analogy offered by the recently emerging trend of state decisions predicating liability upon negligent fire or electrical inspections. *See, e. g., Adams v. State*, 555 P.2d 235 (Alaska 1976); *Campbell v. City of Bellevue*, 85 Wash.2d 1, 530 P.2d 234 (Wash. 1975). *See generally State Liability for Negligent Fire Inspection*, 13 Colum. J. L.

& Soc. Prob. 303 (1977); *Municipal Liability for Negligent Inspections*, 12 Williamette L.J. 188 (1975). Such government regulation can be more easily characterized as intended for the benefit and safety of those inspected. The primary goal of bank regulation, however, can most appropriately for our purposes be viewed as the protection of the national economy and banking system— not the protection of individual institutions. *See Harmsen v. Smith*, 586 F.2d 156, 158 (9th Cir. 1978) ("[b]ank examinations are not beacons to light the path of erring directors or gulled stockholders"); *In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723, 731 (E.D.N.Y.1978) (statutes "not for the benefit of banks and bank directors").

B. *Regulatory Activity Constituting an Assumption of a Duty*

■ Some of the decisions holding that no duty may be implied from the scheme of bank regulatory statutes have nonetheless suggested that under some circumstances the United States may be held liable for such regulatory activity. Two possible theories of liability have been proposed. First, there has been the suggestion that even though the government will not be held liable for negligent acts or omissions, it may be liable when its regulatory activity has been "grossly arbitrary and capricious." *See In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723, 734 (E.D.N.Y. 1978). Second, there has been the suggestion that even though the statutory scheme does not create an actionable duty, "if the Government goes beyond the normal regulatory activities and substitutes its decisions for those of the officers and directors, and if the bank and bank directors reasonably rely on these actions of the Government, the Government may assume a duty to those parties to prevent fraud." *In re Franklin National Bank Securities Litigation*, 445 F.Supp. 723, 733–34 (E.D.N.Y. 1978). *See Harmsen v. Smith*, 586 F.2d 156, 158 (9th Cir. 1978); *Social Security Admin. Baltimore F.C.U. v. United States*, 138 F.Supp. 639, 648 (D.Md.1956).

Although there is considerable doubt whether the "arbitrary and capricious" standard, drawn from the model of judicial review of agency action under the Administrative Procedure Act, *see* 5 U.S.C. §§ 701–706, is appropriate for defining the tort liability of the government for regulatory activity, *cf.* 3 Davis, *Administrative Law*, § 25.13 at 490 (Supp.1965) ("harms of this kind have to be regarded as one of the necessary costs of living in organized society"), we need not now decide whether either of these proposed theories should constitute a basis for liability. The third party plaintiffs have totally failed to establish a sufficient factual basis for either the claim that the bank regulatory agencies acted arbitrarily and capriciously with respect to FNB, or the claim that the agencies somehow exceeded their regulatory authority or actually managed FNB. At their best, the third party plaintiffs' assertions constitute only those "conclusory allegations" and "unsupportable claims" that summary judgment motions are intended to eliminate. *Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970). *See generally* Louis, *Federal Summary Judgment Doctrine: A Critical Analysis*, 83 Yale L.J. 745 (1974). The exhaustive discovery underlying this motion for summary judgment—the tens of thousands of pages of documents, deposition transcripts, interrogatories, Congressional hearings and SEC investigations—offers no indication whatsoever that either the OCC, the FDIC, the FRB or the FRBNY exceeded the proper scope of their regulatory activity. It is almost inconceivable that any of the possible testimony now shrouded by some of the primary defendants' assertions of their privilege against self incrimination would alter this conclusion.

The banking laws grant the OCC, the FDIC and the FRB sweeping supervisory and enforcement powers. *See* 1 Davis, *Administrative Law*, § 4.04 at 247 (1965) ("The regulation of banking may be more intensive than the regulation of any other industry."); Englert, *Bank Supervision in Historical Perspective*, 34 Bus. Lawyer 1659 (1979). Even the briefest survey reveals their breadth.

The supervisory authority of the Comptroller extends over all aspects of a bank's existence. He certifies an institution's entry into the banking business, 12 U.S.C. § 27, and authorizes subsequent changes in its name or location, 12 U.S.C. § 30, and status, 12 U.S.C. § 51. His approval is required for any branching, 12 U.S.C. § 36, reorganization, 12 U.S.C. § 207, consolidation, 12 U.S.C. § 215, or merger, 12 U.S.C. § 215(a). Statutorily specified changes in a bank's capital structure, *see, e. g.*, 12 U.S.C. §§ 51a, 51b, 51b–1, 57 & 59, or increases in its declared dividends, 12 U.S.C. § 60, also require his approval. In the event that a bank suffers serious financial difficulty, he may appoint a caretaker-conservator, 12 U.S.C. §§ 203, 205, or, if necessary, declare its insolvency and appoint its receiver, 12 U.S.C. § 191. The Comptroller's "visitorial power," authorizing on-the-scene examinations of a bank's conduct of business, provides the information necessary to effectively exercise these broad powers. 12 U.S.C. § 481. The frequency of these bank examinations, their scope, the sources of information, and the methods of obtaining it are all committed to the Comptroller's discretion. 12 U.S.C. § 481. If an examination discloses weakness or problems, the Comptroller may make any kind of "recommendations or suggestions" to the bank, and may publish the confidential Report of Examination if the bank fails to comply. 12 U.S.C. §§ 481, 1818.

The FRB and the Federal Reserve Banks have comparably broad authority over bank holding companies, their subsidiaries, and members of the Federal Reserve System. Unique among these powers, of course, is the Board's ability to extend credit to banks through the reserve banks. *See, e. g., Huntington Towers, Ltd. v. Franklin National Bank*, 559 F.2d 863 (2d Cir. 1977). In this case, cooperating with other governmental agencies' over one-and-a-half billion dollars of credit was extended to keep FNB afloat until most of its large creditors had disembarked and it could be permitted to sink without undue damage to the econo-

my. Like the OCC, the FNB may conduct bank examinations in the course of exercising its broad powers. 12 U.S.C. § 483. The FDIC, too, is granted wide regulatory, *see, e. g.,* 12 U.S.C. § 1818(a), and examination authority, 12 U.S.C. § 1820(b), to aid its maintenance of the insurance fund.

The banking statutes grant these agencies flexible and far reaching enforcement tools. The most important is their ability to issue and enforce cease and desist orders. 12 U.S.C. § 1818. *See generally* S.Rep.No. 1482, 89th Cong., 2d Sess. (1966), *reprinted in* [1966] U.S.Code Cong. & Admin.News 3532. An agency may use this power to prevent violations of a bank's agreements with the Comptroller; to stop violations of any "law, rule, or regulation, or any condition imposed in writing by the agency in connection with the granting of any application or other request by the bank," 12 U.S.C. § 1818(b)(1); or to prevent any practice or procedure that the Comptroller, in his discretion, deems "an unsafe or unsound practice," 12 U.S.C. § 1818(b)(1). Cease and desist orders have been used to regulate all aspects of a bank's operations. *See, e. g., Groos National Bank v. Comptroller of the Currency,* 573 F.2d 889 (5th Cir. 1978); *First National Bank of Eden v. Department of the Treasury, Office of the Comptroller of the Currency,* 568 F.2d 610 (8th Cir. 1978). This enforcement tool is supplemented by the agencies' power to remove a director, officer, or "any other person participating in the conduct of the affairs of [a national banking association]," for, among others, the following grounds: the breach of the terms of a cease and desist order; the violation of a rule, regulation or law; participation in an unsafe or unsound banking practice; and enumerated acts of dishonesty or "unfitness." 12 U.S.C. § 1818(e), (f) & (g).

These extensive powers are further magnified by the informality and flexibility that characterizes much of the agencies' regulatory activity. Achieving voluntary compliance with laws, recommendations and agreements is often the rule rather than the exception. The agencies' potent alternative of formal enforcement proceedings usually insures such voluntary compliance: "Recommendations by the agencies concerning banking practices tend to be followed by bankers without the necessity of formal compliance proceedings." *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1962). The bank regulatory agencies have used these informal procedures to control all aspects of a bank's business. *See, e. g., Oversight on the Condition of the Banking System and Review of General Accounting Office Report to Congress on a Study of Federal Supervision of State and National Banks,* Hearings Before the Committee on Banking, Housing and Urban Affairs, United States Senate, 95th Cong., 1st Sess. 1145–50 (1977).

When viewed against this statutory scheme of powers, and this pattern of informal enforcement, none of the actions taken by these agencies with respect to FNB stands out as extraordinary. The Government's recommendations for changing procedures in the bank's troubled departments; the numerous examinations conducted by the Government and the daily reporting required; the Comptroller's and the FDIC's close supervision of possible merger discussions; the FRB's massive loans to FNB; the demands for changes in key management positions; the FRB's close supervision of FNB's asset portfolio, and all of the other actions emphasized by the third party plaintiffs, are fully consistent with the scheme of intensive bank regulation drafted by Congress. There is no substance to the allegations in the third party complaints that the OCC, the FNB, the FDIC or the FRBNY engaged in "extra-regulatory" activity. As the Second Circuit has observed, the FRB "was doing, for better or worse, what Congress expected it to do." *Huntington Towers Ltd. v. Franklin National Bank,* 559 F.2d 863, 868 (2d Cir. 1977).

The numerous Congressional investigations of FNB's collapse lend assurance to this conclusion. *See, e. g.,* H.Rep.No.94– 1669 (*Adequacy of the Office of the Comptroller of the Currency's Supervision of Franklin National Bank*), 94th Cong., 2d

Sess. (1976); *Oversight on the Condition of the Banking System and Review of General Accounting Office Report to Congress on a Study of Federal Supervision of State and National Banks*, Hearings Before the Committee on Banking, Housing and Urban Affairs, United States Senate, 95th Cong., 1st Sess. (1977). Congress has closely examined the FNB regulatory activity in question and has made no move to change the law. Although certainly not decisive on the issue now before us, these Congressional studies suggest that despite the possible hindsight judgments and the possible criticisms of what the agencies did and did not do, it is impossible to conclude that the OCC, the FDIC, the FRB and the FRBNY were not acting within the scope of the statutory scheme.

It is equally impossible to conclude that the Government's regulation of FNB was either arbitrary or capricious. It has been urged that the agencies' actions benefited some creditors of FNB more than others. *See also* Sinkey, *Franklin National Bank of New York: A Portfolio and Performance Analysis of Our Largest Bank Failure*, FDIC Working Paper No. 75–10; Welles, *The Needlessly High Cost of Folding Franklin National*, New York Magazine (Nov. 18, 1974); Rose, *What Really Went Wrong at Franklin National*, Fortune (October 1974). But if that did occur, it is only the result of the unavoidable conflict between the interests of a regulated bank—and its stockholders and creditors—and the broader public interest as viewed by the responsible government officials. The bank regulatory agencies, of course, are charged with protecting the public interest, and here all the actions of the agencies were arguably designed to preserve the stability of the banking system, to minimize the losses to the public, and to reduce the possibility of grave national and international financial repercussions.

III. *The Discretionary Function Exception to the Federal Tort Claims Act*

Even if the third party plaintiffs could successfully argue the implication of a duty from the bank regulatory statutes, or could establish facts supporting the theory of an assumed duty, it is highly unlikely that the resulting cause of action could be brought under the Federal Tort Claims Act. That Act does not afford a blanket waiver of the Government's sovereign immunity from suit; the waiver is narrowly circumscribed. Section 2680(a) of the Act provides that sovereign immunity has not been waived with respect to discretionary functions—i. e.,

> Any claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The legislative history of this exception displays Congress' clear intention that government agencies should not be liable for the effects of their regulatory activity. Discussions of the suits that would be possible under the proposed bill were always limited to the "ordinary common law type of tort," Hearings on H.R.5373 and H.R. 6463, the House Committee on the Judiciary, 77th Cong., 2d Sess. 24 (1942); the most frequently mentioned example was the automobile collision. *See, e. g.,* Hearings on H.R.5373 and H.R.6463, Before the House Committee on the Judiciary, 77th Cong., 2d Sess. 29 (1942) (discussing the "era of steadily growing Government activity, involving considerable use of automobiles and other mechanical equipment capable of causing damage to persons and property"); H.R.Rep.No.2428, 76th Cong., 3d Sess. 3 (1940). The debates convey no sense that Congress imagined it was creating a new allocation of the risks attendant upon governmental policy decisions and regulatory activity. Discussions of the possible ambit of Government liability under the Act always emphasized the presence of "certain limitations required for the protection of important governmental functions." Hearings on H.R.5373 and H.R.6463 House Committee on the Judiciary, 77th Cong., 2d Sess. 30 (1942). *See* H.R.Rep.No.1287, 79th Cong., 1st Sess. 1 (1945).

An early draft of the proposed Act makes clear the purpose that the activities of regulatory agencies would be included in this category of exempt governmental functions; the draft expressly excluded from the waiver of immunity, "Any claim for damages caused by the administration of any law or laws by the Federal Trade Commission or by the Securities and Exchange Commission." Hearings on H.R.5373 and H.R.6463, Before the House Committee on the Judiciary, 77th Cong., 2d Sess. 4 (1942). The language of the exception ultimately adopted was substituted for the earlier provision to insure that regulatory activity by any administrative agency would be exempt from liability.

> It is . . . designed to preclude application of the bill to a claim against a regulatory agency, such as the Federal Trade Commission or the Securities and Exchange Commission, based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved. To take another example, claims based upon an allegedly negligent exercise by the Treasury Department of the blacklisting or freezing powers are also intended to be excepted. The bill is not intended to authorize a suit for damages to test the validity of or provide a remedy on account of such discretionary acts even though negligently performed. or involving an abuse of discretion.

H.R.Rep.No.1287, 79th Cong., 2d Sess. 6 (1945). See Hearings on H.R.5373 and H.R. 6463, Before the House Committee on the Judiciary, 77th Cong., 2d Sess. 29 (1942) (suggesting that the earlier draft would have been interpreted by "judicial construction" to cover the "cases embraced within" the language finally adopted).

■ Defining the scope of this exception for discretionary functions has proved troublesome, since almost any action by an agency or official can be argued to involve at least some discretion. See, e. g., Ham v. Los Angeles County, 46 Cal.App. 148, 162, 189 P. 462, 468 (1920) ("It would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved the driving of a nail."); Jaffee, Suits Against Governments and Officers: Damage Actions, 77 Harv.L.Rev. 209, 222 (1963); Note, The Discretionary Function Exception of the Federal Tort Claims Act, 66 Harv.L.Rev. 488, 490 (1953). Courts have tried to resolve this difficulty by focusing upon the quality of the discretion involved. Guidance has been drawn from the historical evidence that Congress intended to exempt claims arising from decisions basic to the act of governing. "Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions." Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 966, 97 L.Ed. 1427 (1953).

The bounds of this concept of important governmental functions have been marked by a distinction between "planning" level activity and "operational" level activity. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 971, 97 L.Ed. 1427 (1953). Planning activity involves the formulation of policy and program; operational activity, the more ministerial problems of implementation. Compare Mahler v. United States, 306 F.2d 713 (3rd Cir. 1962) and U.S. v. Hunsucker, 314 F.2d 98 (9th Cir. 1962) and White v. United States, 317 F.2d 13 (4th Cir. 1963) and United States v. Faneca, 332 F.2d 872 (5th Cir. 1964), cert. denied, 380 U.S. 971, 85 S.Ct. 1327, 14 L.Ed.2d 268 (1965) and Sayre v. United States, 282 F.Supp. 175 (N.D.Ohio 1967) (planning activity) with Downs v. United States, 522 F.2d 990 (6th Cir. 1975) and Eastern Air Lines Inc. v. Union Trust Co., 95 U.S.App. D.C. 189, 221 F.2d 62 (D.C. Cir. 1955) and Am. Exch. Bank v. U.S., 257 F.2d 938 (7th Cir. 1958) (operational activity). The primary inquiry concerns the quality and character of the decision making involved: "whether the nature of the judgment called for policy considerations," Griffin v. United States, 500 F.2d 1059, 1064 (3rd Cir. 1974); whether those considerations involved basic issues of governmental policy and the public interest; whether the deci-

sion called for was central to the realization of those policies; and whether the decision required informed judgment and expertise. *See, e. g., Griffin v. United States,* 500 F.2d 1059 (3rd Cir. 1974); *Smith v. United States,* 375 F.2d 243 (5th Cir. 1967). *Cf. King v. Seattle,* 84 Wash.2d 239, 525 P.2d 228 (1974); *Jones v. State,* 33 N.Y.2d 275, 307 N.E.2d 236 (1973); *E.U.B. v. State,* 67 Wash.2d 246, 407 P.2d 440 (1965) (interpreting state law exceptions for discretionary functions). Additional considerations deemed relevant are whether a statute has granted an official discretionary authority, using language like "discretion," "may," or "appropriate," *see, e. g., Schmidt v. U.S.,* 198 F.2d 32 (7th Cir. 1952); *Denny v. U.S.,* 171 F.2d 365 (5th Cir. 1948); *Matveychuk v. U.S.,* 195 F.2d 613 (2d Cir. 1952), and whether the decision at issue was made at a high level of authority, *see* Note, *The Discretionary Function Exception to the Federal Tort Claims Act,* 66 Harv.L.Rev. 488 (1953).

█ This judicial interpretation of the scope of the discretionary function exception leaves little doubt that there is no claim for relief against the United States under the Federal Tort Claims Act for the regulation of FNB by the OCC, the FDIC, the FRB and the FRBNY. The bank regulatory statutes, as previously noted, grant sweeping discretionary powers to these agencies. The decisions here to exercise or not exercise those powers were all made at the highest levels of government. The critical choices were made by senior officials with special skills, training and expertise. Weighty considerations of policy and the public interest were central to those decisions; crises in the banking industry involve important national and international ramifications. In short, this was precisely the type of agency regulatory activity that Congress exempted from the coverage of the Federal Tort Claims Act. *See, e. g., Davis v. FDIC,* 369 F.Supp. 277 (D.Colo. 1974); *Harmsen v. Smith,* Civ. No. 73–450E (S.D.Cal. July 28, 1975), *aff'd on other grounds,* 586 F.2d 156 (9th Cir. 1978); *Huntington Towers, Ltd. v. Franklin Nat. Bank,* 559 F.2d 863 (2d Cir. 1977). *But see In re Franklin National Bank Securities*

*Litigation,* 445 F.Supp. 723, 735 (E.D.N.Y. 1978) (suggesting that extraregulatory activity, constituting "control" of the bank might not be exempt).

Of all the regulatory actions involved here, only the alleged failure of the OCC's bank examinations to discover the putative dishonesty at FNB could arguably be outside the ambit of the discretionary function exception. *Cf. Harmsen v. Smith,* Civ. No. 73–450E (S.D.Cal. July 28, 1975), *aff'd on other grounds,* 586 F.2d 156 (9th Cir. 1978) (suggesting that a failure to follow OCC examination procedures is outside the exception); *Social Security Admin. Baltimore F.C.U. v. United States,* 138 F.Supp. 639, 660 (D.Md.1956) (suggesting that once a problem is discovered, the examiner's failure to fully investigate is outside the exception). To be sure, the mechanics of conducting an examination do not implicate the policy choices central to the other agency actions now at issue. Nonetheless, those examinations are in integral part of the regulatory process, designed primarily to assist high governmental officials in controlling the entire banking industry. Concluding that they stand outside the discretionary function exception would undermine the immunity from suit that Congress intended to grant that process. Sound policy considerations support this conclusion that the Federal Tort Claims Act's waiver of sovereign immunity does not extend to suits based upon the regulation of FNB by these governmental banking agencies.

Although the concept of sovereign immunity is deeply rooted in common law traditions, *see generally* Jaffee, *Suits Against Governments and Officers: Sovereign Immunity,* 77 Harv.L.Rev. 1 (1963); Blachly & Oatman, *Approaches to Government Liability in Tort,* 9 Law & Contemp.Prob. 181 (1942); Borchard, *Government Liability in Tort,* 34 Yale L.J. 1 (1924), a different scheme of government liability is not inconceivable. French law, for example, goes much further in allowing suits based upon legislative or administrative action. *See generally* Braband, *Liability in Tort of the Government and Its Employees: A Com-*

parative Analysis with Emphasis on German Law, 33 N.Y.U.L.Rev. 18 (1958); Schwartz, Public Tort Liability in France, 29 N.Y.U.L.Rev. 1432 (1954); Jacoby, Federal Tort Claims Act and French Law of Governmental Liability: A Comparative Study, 7 Vand.L.Rev. 246 (1954). Such a broader rule of liability promotes some worthy values and policies. Simple considerations of justice, for example, support the compensation of victims damaged by governmental acts. See, Harper & James, The Law of Torts, § 29.10 at 1640–41 (1952). Cf. Zillman, The Changing Meanings of Discretion: Evolution in the Federal Tort Claims Act, 76 Military L.Rev. 1 (1977) (suggesting a sensitivity to the need for compensation has led to a narrowing of immunity). Requiring the government to provide that compensation may well produce the most equitable allocation of risk and burden of loss; since society as a whole benefits from governmental regulatory activity, arguably society should share equally in the costs of compensation when the regulatory system causes harm or breaks down. See Van Alstyne, Governmental Tort Liability: A Public Policy Prospectus, 10 U.C. L.A.L.Rev. 463 (1963); 3 Davis, Administrative Law, § 25.17 at 504 (1965) (suggesting "a beneficent governmental unit ought not to allow exceptional losses to be borne by those upon whom the governmental activity has happened to inflict them."). It might even be argued that a broader rule of liability would promote better governmental decision making; possibility of liability would encourage more care in evaluating proposed policies and programs, and a more accurate balancing of the desired benefits with the possible risks and costs. See generally An Economic Analysis of Sovereign Immunity in Tort, 50 So. Cal.L.Rev. 515 (1977).

These possible benefits from a broader rule of government liability, however, are outweighed in the United States by our pattern of separation of governmental executive, legislative and judicial authority. The numerous problems arising from the "intricate issues about [the] proper distribution of governmental powers," 3 Davis, Administrative Law § 25.11 at 484 (1965), involve both considerations of the most effective distribution of power and responsibility, and considerations of the constitutionally mandated separation of powers.

Officials of administrative agencies possess resources and expertise unavailable to courts. Their policy decisions rest upon delicate technical and political judgments of the risks and benefits of possible courses of action. It is highly unlikely that damage actions brought in the courts will consistently produce a more desirable balancing of the competing policy considerations. "A judge or a jury is not well equipped either to make such determinations or to review them." Jaffe, Suits Against Governments and Officers: Damage Actions, 77 Harv.L. Rev. 209, 235 (1963); 3 Davis, Administrative Law, § 25.11 at 490 (1965) ("The second guess of a court in a damages suit is about as likely to be wrong in an absolute sense as the first guess" of the agency involved).

Moreover, allowing such review of agency policy decisions in the guise of damage actions would disrupt the intricate balance of power among the branches of government that the constitution requires; it would unduly elevate the courts. See Raichle v. Federal Reserve Bank, 34 F.2d 910, 915 (2d Cir. 1929) ("The remedy sought would make the courts, rather than the Federal Reserve Board, the supervisors of the Federal Reserve System, and would invoke a cure worse than the malady."). The extent that agency officials have inadequately exercised their discretion, or have inequitably balanced the risks of agency action, presents a political problem to be solved by legislation or changes in agency personnel, and not a judicial problem to be solved by the imposition of tort liability. Cf. Weiss v. Fote, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (1960); King v. Seattle, 84 Wash.2d 239, 525 P.2d 228 (1974) (state court decisions implying a discretionary function exception in statutes waiving sovereign immunity because of similar practical and constitutional considerations).

The critical national and international ramifications of crises in the banking industry require that the initiative and imagina-

tion of the regulators not be stifled by the threat of tort actions against the United States. Congress' grant of broad discretionary powers to banking regulators acknowledges this necessity for creativity and innovation. Removing this cloud over Government regulation of the banking industry will encourage firmer protective action in an industry that, today, faces serious—perhaps even dangerous—problems.

## IV. *Practical Considerations Requiring Denial of the Motion*

■ In spite of these persuasive arguments for granting the Government's motion for summary judgment, more practical considerations, looking to the posture of this complex multidistrict litigation, require that the motion be denied. Although Rule 56 of the Federal Rules of Civil Procedure states that summary judgement "shall" be rendered when the stated conditions are met, the rule is not mandatory in operation: "a motion for summary judgment is always addressed to the discretion of the court." *Perma Research & Development Company v. Singer Company*, 308 F.Supp. 743, 750 (S.D.N.Y.1970); *Boston and Maine Railroad v. Lehigh and New England Rail Co.*, 188 F.Supp. 486, 490 (S.D.N.Y.1960). *See generally* 6 Moore, *Federal Practice*, § 56.15[6] (1978). Satisfying the basic requirements of the rule does not guarantee that the motion will be granted: "Even in cases where the movant has technically discharged his burden, the trial court in the exercise of a sound discretion may decline to grant summary judgment." *National Screen Service Corp. v. Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir. 1962); *Flores v. Kelley*, 61 F.R.D. 442, 445 (N.D. Ind.1973); *Continental Can Company v. Crown Cork & Seal Inc.*, 39 F.R.D. 354, 357 (E.D.Pa.1965); *John Blair & Company v. Walton*, 47 F.R.D. 196, 197 (D.C.Del.1969); 6 Moore, *Federal Practice*, § 25.15[6] at 56–643 (1978).

■ Predominant among the considerations that guide this discretion is Rule 1's declaration that the Federal Rules of Civil Procedure "shall be construed to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. Thus, the courts must attempt to achieve a "more orderly and expeditious handling of the entire litigation," *Powell v. Radkins*, 506 F.2d 763, 765 (5th Cir. 1973), and to "facilitate appellate review," *Fine v. City of New York*, 71 F.R.D. 374, 375 (S.D.N.Y.1976). *Cf. Taylor v. Rederi A/S Volo*, 374 F.2d 545, 549 (3d Cir. 1967) (suggesting that summary judgment may be inappropriate if it will not expedite the proceeding because "a part of [the] action [is] ripe for summary judgment but it is intertwined with another claim that must be tried"); *Dunham-Bush, Inc. v. Mills*, 72 F.R.D. 42, 46–7 (S.D.N.Y. 1976) (suggesting summary judgment is inappropriate if it will not expedite proceedings since trial of closely related issues "must be conducted in any event"). Pragmatism must enlighten this discretion. "The golden doctrine that runs through and harmonizes the decisions is that the basic principles governing the summary judgment procedure be accommodated in a common sense manner to the realities of the litigation at hand." 6 Moore, Federal Practice § 25.16 at 56–670 (1978).

Such practical considerations require the denial of this motion for summary judgment. In this complex multidistrict dispute, the trial court must remain cognizant of the fact that it is an entire series of related disputes it is seeking to resolve. The slight unfairness to one litigant of denying its motion for summary judgment may be more than overbalanced by advantages to all of the other litigants and the court system itself in more expeditious and fairer disposition of the whole dispute. Among these balancing factors are the following:

(1) Even though these claims against the Government are highly unlikely ultimately to prevail, the evidence relevant to these claims is also relevant to many other basic issues in this litigation—particularly those concerning the determination of the causes of any injury to FNB and the measurement of any damages. All of these issues will be tried regardless of the disposition of the claims against the Government. Summary judgment will not shorten the trial. The continued presence of the Government in

the litigation should insure a more full and fair development of the evidence.

Were the moving party an individual who might find the costs of the litigation burdensome, this would be a weighty factor tilting towards granting of the motion. Cost of the litigation is not a substantial factor where the Government is involved, particularly since many of the witnesses are present and former officials of the OCC and its counsel will need to be in court during most of the trial to advise them.

(2) If a motion for summary judgment were granted now, it might be reversed under the stringent standard applied by some of the panels of the Second Circuit. The court cannot ignore the fact that judges sitting on the Court of Appeals for this Circuit have differed widely in their support of summary judgment procedure. Moreover, the panels often contain one or more judges from other courts whose views on this subject are unknowable to the trial judge faced with a dispositive motion. In the instant case, for example, a petition by the Government for mandamus to compel granting of its motion for summary judgment was denied by a panel consisting of one circuit and two district judges. *See also, e. g.*, 1979 Ann.Rep.Div.Admin.Office U.S.Courts 51 (1979) (participation by visiting judges in Courts of Appeals decisions).

Absence of consistent guidance from above in the run-of-the-mill case is no great problem; the district judge decides as best he or she can and ignores the problem of possible reversal. But the circumstances here are unique. The trial of this action may well span six months; the evidence likely to be presented is staggering. Since the evidence relevant to the claims against the Government so closely overlaps that relevant to the rest of the litigation, a reversal would necessitate a costly and inefficient retrial. Given the pressures of other litigation in this court, it would be unfair to other litigants and judges of this court to run the serious risk of tying up a trial part for an additional six months. Since the trial will not be appreciably shortened by granting a motion for summary judgment, it is more expedient to try all of these claims together, now.

(3) While it is improbable to the vanishing point that anything crucial to the issues of summary judgment will be turned up by further discovery or by trial, key witnesses have yet to be deposed. The various FNB officials who have thus far pleaded privilege against self-incrimination may have unexpected light to throw on the claims made against the Government. We cannot tell. Given the other practical reasons for denying the motion for summary judgment, there appears no warrant for taking even the slightest risk of committing inadvertent injustice.

(4) Extensive settlement conferences have been conducted by the Court and the parties. The OCC is a necessary participant in any realistic appraisal of the various claims. One of the three directors of the FDIC, which has the key role in settlement discussions, is the Comptroller of the Currency. The court expects the Comptroller, among others, to utilize his knowledge and experience in discussions leading towards settlement. It is the court's view that the probabilities of settlement will be enhanced if the motion for summary judgment is not granted at this time.

The motion for summary judgment is denied, with leave to renew. On renewal, the motion was granted.