The STATE OF NORTH DAKOTA,
d/b/a Bank of North
Dakota, Appellant,

v.

MERCHANTS NATIONAL BANK AND TRUST COMPANY, FARGO, NORTH DAKOTA; Red River National Bank and Trust Company, Grand Forks, North Dakota; Jamestown National Bank, Jamestown, North Dakota; Union National Bank, Minot, North Dakota; Wahpeton National Bank, Wahpeton, North Dakota, Appellees.

No. 79–1342.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 16, 1980.

Decided Aug. 6, 1980.

Peter B. Work, Crowell & Moring, Washington, D.C., and Maurice E. Cook, Sp. Asst. Atty. Gen., Bismarck, N. D., for appellant.

Frank J. Magill, Fargo, N. D., and David A. Ranheim, Paul J. Scheerer, and Darron C. Knutson, Minneapolis, Minn., for appellees.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D. C., James R. Britton, U. S. Atty., Fargo, N. D., Ronald R. Glancz and Linda Jan S. Pack, Attys., Dept. of Justice, Civil Division, Appellate Staff, and Dorothy A. Sable and Marilyn Britwar, Attys., Washington, D. C., for amicus curiae, Comptroller of Currency.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, STEPHENSON, HENLEY and McMILLIAN, Circuit Judges, En Banc.

HENLEY, Circuit Judge.

The State of North Dakota appeals from an order of the district court,[1] granting the motion of the five defendant national banks to dismiss the State's complaint for failure to state a claim on which relief could be granted. The State had sought to enjoin defendants from using their newly adopted names, on the ground that the names were confusingly similar to that of the State's central bank and would thus violate the North Dakota common law of unfair competition. The district court based its dismissal on the finding that all state law otherwise applicable to name changes of national banks was preempted by section 30 of the National Bank Act (NBA). Although we conclude that the preemption effected by section 30 is somewhat limited in scope, we affirm the judgment of the district court.

## FACTS AND PROCEDURAL BACKGROUND

In September, 1976 the five appellee national banks, all of which are located in North Dakota, applied to the Comptroller of the Currency under section 30 of the NBA[2] to change their names to "First Bank of North Dakota (N.A.)-[city or town where located]." The State, which operated its central financial institution under the name "Bank of North Dakota," objected to the proposed changes and was allowed to present its arguments and evidence at a hearing before the Regional Administrator of the Comptroller's office. Subsequently, in February, 1977, the Comptroller approved all five name changes.

In March, 1977 the State brought this action against the Comptroller and the banks in the federal district court of North Dakota, seeking review of the Comptroller's decision and an injunction barring banks from implementing the name changes. Shortly after the action was commenced, a preliminary injunction was denied, and in May, 1977 the new names became effective. In September, 1977 the district court held the Comptroller's decision was not arbitrary or capricious and dismissed the suit.

On appeal the State abandoned its argument that the Comptroller's decision was invalid, and this court therefore affirmed the district court's dismissal of all claims against the Comptroller. *State of North Dakota v. Merchants National Bank & Trust Co.*, 579 F.2d 1112, 1113, 1115 (8th Cir. 1978). The State maintained, however, that the district court had ignored its pendent claim against the banks for violation of the state common law of unfair competition. Although this court found only an "oblique" reference to state common law in plaintiff's complaint and was "inclined to hold that the matter had not been properly presented to the District Court," the appellee banks "strenuously contend[ed] that the claim had been presented to and decided by the District Court." *Id.* at 1114. Therefore, this court considered the issue and, finding no mention of the common law claim in the trial court's opinion, remanded the case for further proceedings on that claim.

Upon remand, Judge Benson requested memoranda from the parties on whether the North Dakota common law of unfair

---

1. The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota.

2. 12 U.S.C. § 30 (1976) provides:

   Any national banking association, with the approval of the Comptroller of the Currency, may change its name .... A duly authenticated notice of ... the new name ... shall be sent to the Comptroller of the Currency; but no change of name ... shall be valid until the Comptroller shall have issued his certificate of approval of the same.

competition was preempted by federal law in the area of name changes by national banks. Along with their memorandum on this point, defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In March, 1979 the court granted that motion. *State of North Dakota v. Merchants National Bank & Trust Co.*, 466 F.Supp. 953 (D.N.D.1979).

The district court began its analysis by noting that "[t]he National Bank Act is a comprehensive code creating and regulating the national banks of the United States, 'constituting by itself a complete system for the establishment and government of national banks ....'" *Id.* at 954 (quoting *Cook County National Bank v. United States*, 107 U.S. 445, 448, 2 S.Ct. 561, 564, 27 L.Ed. 537 (1883)). The court then observed that some sections of the NBA expressly incorporate state law, whereas section 30 does not. The court concluded that "[b]y making reference to state law in other sections of the [NBA] and omitting all such reference in Section 30, Congress has signalled its clear intent that Section 30 is meant to be pre–emptive." *Id.* at 955. Finding that the state law of unfair competition, on which the State based its claim, was preempted, the court dismissed the suit. The State has appealed this decision.

## JURISDICTION

■ A threshold question on this appeal, though not raised by either party, is whether the district court had subject matter jurisdiction of the State's common law unfair competition claim. In the opinion on the previous appeal of this case, then–Chief Judge Gibson noted:

Unless independent jurisdictional grounds are shown, the District Court may determine whether it should hear the case as within its pendent jurisdiction or dismiss without prejudice to relief being sought in state courts.

579 F.2d at 1115. On remand, the district court requested the parties to submit memoranda on whether the common law claim was properly before the court, and both parties responded that it was, as a pendent claim. The court proceeded to consider the claim on the merits, apparently concluding there was pendent jurisdiction. For the reasons stated below, we hold that pendent jurisdiction of the unfair competition claim existed and that its exercise in this case was proper.

The difficulty with finding pendent jurisdiction in the present case stems less from the nature of the claims themselves than from the fact that the two claims involved different defendants. If the difference in defendants is for the moment disregarded, it is clear that the case satisfied the constitutional requirements of pendent jurisdiction as set out in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[3] First, the claim arising under federal law was jurisdictionally "substantial." Second, the federal and state claims had a "common nucleus of operative fact" in the defendant banks' adoption of new names and the Comptroller's approval thereof. And third, plaintiff would ordinarily be expected to try both claims in one proceeding because a single interest of plaintiff's was affected.

3. In *UMW v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court reformulated the previous "same–cause–of–action" test for pendent jurisdiction which had been established in *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). The *Gibbs* Court stated:

Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim "arising under [federal law]," U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The

federal claim must have substance sufficient to confer subject matter jurisdiction on the court.... The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

383 U.S. at 725, 86 S.Ct. at 1138 (citation and footnotes omitted; emphasis original).

Assuming these constitutional prerequisites are met, *Gibbs* further requires that, as a matter of discretion, pendent jurisdiction be exercised only when "considerations of judicial economy, convenience and fairness to litigants" will be served.[4] In the present case, there are several reasons for assuming jurisdiction of the state claim. First, the substantial investment of judicial time and resources in the case, by both the district court and this court on the previous appeal, to a degree justifies the exercise of jurisdiction over the state claim, even after the federal claim has been dismissed from the suit.[5] Second, the question whether the state claim is preempted by federal law is, as recognized in *Gibbs*,[6] particularly suited for resolution in federal court. Finally, as regards "fairness to [the] litigants," both plaintiff and defendants urged the district court to decide the state claim.

Thus, the *Gibbs* requirements were fully satisfied in this case. Remaining is the question whether pendent jurisdiction of the unfair competition claim existed despite the fact that the defendants to that claim, the appellee banks, were not parties to the claim for review of the Comptroller's decision, upon which federal jurisdiction was based. The pre–*Gibbs* rule was that pendent jurisdiction would lie only if the federal and state claims involved the same parties. Someone like the appellee banks, as to whom there was no independent grounds for federal jurisdiction, could not be haled into federal court as the defendant on a pendent state claim. Although *Gibbs* broadened the general test for pendent jurisdiction, the facts in *Gibbs* did not require departure from this "same–parties" limitation. 3A Moore's Federal Practice ¶ 20.-07[5.–1], at 20–72 to –73 (2d ed. 1977); 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3567, at 456–57 (1975).

On the other hand, nothing in the language or reasoning of *Gibbs* necessarily limited its applicability to cases where the defendant to the pendent claim was also a party to the federal claim. *See Aldinger v. Howard*, 427 U.S. 1, 20–21, 96 S.Ct. 2413, 2423, 49 L.Ed.2d 276 (1976) (Brennan, J., dissenting); *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d 800, 809 (2d Cir. 1971) (quoting *Astor–Honor, Inc. v. Grosset & Dunlap, Inc.*, 441 F.2d 627, 629 (2d Cir. 1971)). Thus, after *Gibbs* but before *Aldinger v. Howard, supra*, many of the lower federal courts held that when the *Gibbs* standards are met, a district court has jurisdiction of a state law claim against a "pendent party," *i. e.*, a defendant who is not a party to the federal claim and as to whom no independent basis for federal jurisdiction

4. The *Gibbs* Court emphasized that pendent jurisdiction

> need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims . . . .

383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted).

5. *See Rosado v. Wyman*, 397 U.S. 397, 403, 405, 90 S.Ct. 1207, 1213, 1214, 25 L.Ed.2d 442 (1970); *Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340 at 1346–1347 (8th Cir. 1980) (citing *Kuhn v. Letter Carriers Branch 5*, 528 F.2d 767, 771 n. 6 (8th Cir. 1976)); *Federal Prescription Serv., Inc. v. Amalgamated Meat Cutters*, 527 F.2d 269, 274 (8th Cir. 1975); *Gray v. Heat & Frost Insulators Local 51*, 447 F.2d 1118, 1120 (6th Cir. 1971).

6. 383 U.S. at 727, 86 S.Ct. at 1139:

> There may . . . be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong. In the present case, for example, the allowable scope of the state claim implicates the federal doctrine of pre–emption; while this interrelationship does not create statutory federal question jurisdiction, *Louisville & N. R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 [(1908)], its existence is relevant to the exercise of discretion.

We note that this passage also supports our decision today in *First Nat'l Bank of Aberdeen v. Aberdeen Nat'l Bank*, 627 F.2d 843 (8th Cir. 1980), which holds that preemption of a state law claim brought in state court does not constitute grounds for removal of the action to federal court.

exists. *See, e. g., Bowers v. Moreno*, 520 F.2d 843, 846–48 (1st Cir. 1975); *Curtis v. Everette*, 489 F.2d 516, 519–20 (3d Cir. 1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974); *Almenares v. Wyman*, 453 F.2d 1075, 1083 (2d Cir. 1971), *cert. denied*, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); *Leather's Best, Inc. v. S. S. Mormaclynx*, 451 F.2d 800, 809–11 (2d Cir. 1971) (admiralty claim supported negligence claim against pendent party); *Connecticut General Life Ins. Co. v. Craton*, 405 F.2d 41, 48 (5th Cir. 1968); *Lewis v. Brinegar*, 372 F.Supp. 424, 428–29 (W.D.Mo.1974) (federal question claim against pendent party for less than jurisdictional amount). *But cf. Hymer v. Chai*, 407 F.2d 136, 137 (9th Cir. 1969) (wife's claim for loss of consortium could not be joined as pendent to husband's diversity action for negligence) ("Joinder of claims, not joinder of parties, is the object of" pendent jurisdiction). Although there does not seem to be an Eighth Circuit holding precisely on point with the issue in this case, several of our decisions have indicated a willingness to apply the doctrine of pendent jurisdiction in situations involving parties other than the original plaintiff and defendant.[7]

In *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), however, the Supreme Court made it clear that the *Gibbs* requirements are not the only preconditions of pendent party jurisdiction. The plaintiff in *Aldinger* asserted that because the *Gibbs* tests were satisfied, her state civil rights claim against a county was pendent to her claims against county officials under 42 U.S.C. § 1983. The Court disagreed, concluding that the addition of a new party to respond to the pendent claim called for additional analysis not necessary in *Gibbs*.

The Court reasoned as follows. In *Gibbs*, the defendant to the pendent claim had already been brought into federal court, pursuant to a jurisdictional statute, to answer to the federal claim. Hence, it could be said that Congress had intended for that

---

7. Almost on point with the present case is *Schulman v. Huck Finn, Inc.*, 472 F.2d 864 (8th Cir. 1973). There, plaintiff brought suit for patent infringement and unfair competition against each of four defendants. The district court granted two of the defendants summary judgment on the patent claims, but denied their subsequent motions to dismiss for want of jurisdiction the state unfair competition claims against them. Interlocutory appeal was allowed, and this court affirmed the denials on two alternative grounds, one of which was that the unfair competition claims against the two appellants were pendent to the patent claims against the other two defendants. Although this holding seems at first glance to be an explicit application of pendent party jurisdiction, the procedural context clearly shows that the two appellants were not truly "pendent parties." Because jurisdictionally "substantial" claims of patent infringement had been brought against them, both appellants *were* subject to an independent ground of federal jurisdiction.

In *Hatridge v. Aetna Cas. & Sur. Co.*, 415 F.2d 809 (8th Cir. 1969), an insurance company had brought a declaratory judgment action in federal court on diversity grounds against three parties: the company's alleged insured, an individual who had obtained a tort judgment against the insured, and that individual's wife, who had obtained a judgment against the insured for loss of consortium. Simultaneously, the wife began a direct action against the insurance company in state court, and the company removed that action to federal court on grounds of diversity, even though the wife's claim was for less than the jurisdictional amount. The district court denied the wife's motion to remand, and this court affirmed, mainly for reasons of Arkansas law. As a "supportive ground" for its holding, this court observed that the wife's claim against the insurer was pendent to the insurer's declaratory claim against the husband, which exceeded the jurisdictional amount. This reasoning was probably vitiated by *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) (each member of plaintiff class in Rule 23(b)(3) diversity class action must satisfy jurisdictional amount), but *Hatridge* nevertheless reflects an expansive view of the proper application of pendent jurisdiction.

In *Reserve Mng. Co. v. EPA*, 514 F.2d 492 (8th Cir. 1975) (en banc), this court held that pendent jurisdiction allowed the joinder of a party plaintiff as to whose claims there was no independent jurisdictional ground. *Id.* at 522 n. 55.

*But see Gelley v. Astra Pharmaceutical Prods. Inc.*, 610 F.2d 558 (8th Cir. 1979), and *Kack v. United States*, 570 F.2d 754, 757 n. 4 (8th Cir. 1978) (quoting C. Wright, Handbook of the Law of Federal Courts § 19, at 65 (2d ed. 1970)). Most of the cases adopting the theory of pendent party jurisdiction were decided after 1970. *See* C. Wright, *supra*, § 19, at 75–77 (3d ed. 1976).

kind of defendant to come within the purview of the federal courts. Since Congress had not, however, defined the scope of the "case" that might be brought against him, the Court was free to do so, determining what sort of state claim was part of the same constitutional "case." In contrast, the plaintiff in the pendent party situation seeks to use the *Gibbs* Court's definition of the scope of a "case" so as to bring into federal court a party whom Congress may never have intended to be there. The *Aldinger* Court thus perceived that the allowance of pendent party jurisdiction subject only to the restrictions stated in *Gibbs* "would run counter to the well–established principle that federal courts . . . are courts of limited jurisdiction marked out by Congress." *Id.* at 15, 96 S.Ct. at 2420. For that reason, the Court stated that

> [b]efore it can be concluded that [pendent party] jurisdiction exists, a federal court must satisfy itself not only that Art. III permits it, but that Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence.

*Id.* at 18, 96 S.Ct. at 2422.

Since federal jurisdiction in *Aldinger* was based on 28 U.S.C. § 1343(3), the jurisdictional counterpart of 42 U.S.C. § 1983, and because previous Court decisions established that Congress did not intend municipal corporations to be suable in federal court under those statutes,[8] the *Aldinger* Court held

that there was no pendent jurisdiction of plaintiff's claim against the county. The Court carefully limited its holding:

> [W]e decide here only the issue of so–called "pendent party" jurisdiction with respect to a claim brought under §§ 1343(3) and 1983. Other statutory grants and other alignments of parties and claims might call for a different result. When the grant of jurisdiction to a federal court is exclusive, for example, . . . the argument of judicial economy and convenience can be coupled with the additional argument that *only* in a federal court may all of the claims be tried together.

*Id.* (footnote omitted; emphasis original).

In the present case, federal jurisdiction was based on the general federal question statute, 28 U.S.C. § 1331(a).[9] As this court recently noted, "[t]he Supreme Court has not yet indicated whether pendent party jurisdiction may be exercised when primary jurisdiction is founded on 28 U.S.C. § 1331(a)." *Thomas W. Garland, Inc. v. City of St. Louis*, 596 F.2d 784, 789 n. 4 (8th Cir.), *cert. denied*, 444 U.S. 899, 100 S.Ct. 208, 62 L.Ed.2d 135 (1979). After undertaking the analysis mandated by *Aldinger*, we are convinced that pendent party jurisdiction was not barred in this case.

On its face, the jurisdictional statute [10] gives little indication of what Congress's attitude may have been toward the presence of parties like the appellee banks in

---

8. At the time *Aldinger* was decided, *Monroe v. Pape*, 365 U.S. 167, 187–92, 81 S.Ct. 473, 484–86, 5 L.Ed.2d 492 (1961), and *City of Kenosha v. Bruno*, 412 U.S. 507, 511–13, 93 S.Ct. 2222, 2225–26, 37 L.Ed.2d 109 (1973), were controlling. The holding of those two cases that a municipal corporation was not a "person" within the meaning of § 1983, which was the ground for the specific result in *Aldinger*, was overruled by *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 372–73 n. 12, 98 S.Ct. 2396, 2402 n. 12, 57 L.Ed.2d 274 (1978), however, the Court reaffirmed the *Aldinger* "holding" that the issue whether a federal court has jurisdiction of a non–federal claim involves both constitutional and statutory questions.

9. Since the NBA contains no provision for review of the Comptroller's decisions, and the Administrative Procedure Act is not an independent grant of jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–85, 51 L.Ed.2d 192 (1977), judicial review of the Comptroller's determinations must be pursuant to 28 U.S.C. § 1331(a).

10. 28 U.S.C. § 1331(a) (1976) provides:
    The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States, except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

suits based on the statute. The 1976 amendment of the section, however, which eliminated the required jurisdictional amount in suits for review of federal administrative actions,[11] clearly showed that Congress considered those suits important enough to be allowed without regard to the amount in controversy. The pendent claim in this case seeks to enjoin conduct by private parties that was authorized by the administrative decision to be reviewed. The alleged ground for enjoining the private conduct is the same ground on which the administrative determination is challenged. Furthermore, in a suit like the present one, joinder of the private parties may be necessary if plaintiff is to obtain full relief. In short, the pendent claim in the present case is intimately intertwined with the federal one. In light of the 1976 amendment and Congress's implicit recognition of the importance of judicial review of administrative action, we find that Congress did not intend to exclude parties like the appellee banks from federal court in judicial review actions brought under section 1331(a).

Our conclusion is to some extent supported by the *Aldinger* dictum quoted above, relating to exclusive federal jurisdiction and the argument of judicial economy. Admittedly, there is no grant to the federal courts of exclusive jurisdiction of judicial review actions brought under section 1331(a). And cogent arguments have been made that state courts have power to enjoin unlawful acts of federal officials and thus, presumably, review federal administrative action, unless expressly barred by act of Congress.[12] But most of the recent decisions on point deny such jurisdiction,[13] and even if such an action could be brought in state court, the federal official probably would remove the case to federal court under 28 U.S.C. § 1442(a)(1).[14] Thus, the entire suit is likely to end up in federal court, whether for reasons of exclusivity of jurisdiction or removal, and the situation resembles that posited in the *Aldinger* dictum.

Therefore, we hold that pendent jurisdiction of the unfair competition claim in the present case existed and that the district court did not abuse its discretion by ruling on the claim.

## PREEMPTION

As noted, the district court found that Congress intended that section 30 of the NBA preempt all state law regulating name changes by national banks. On appeal, the State contests both the district court's theory that Congress intended to "occupy the field" and the more limited view that state unfair competition law "conflicts" with section 30 and is preempted for that reason.[15] The appellee banks defend the district court's holding on slightly

---

11. Act of Oct. 21, 1976, Pub.L.No. 94–574, § 2, 90 Stat. 2721, added the "except" clause at the end of 28 U.S.C. § 1331(a), *quoted in* note 10 *supra*.

12. *See* 1 Moore's Federal Practice ⸢ 0.6[5] (2d ed. 1959); Arnold, *The Power of State Courts to Enjoin Federal Officers*, 73 Yale L.J. 1385 (1964).

13. *See, e. g., Alabama ex rel. Gallion v. Rogers*, 187 F.Supp. 848, 852 (M.D.Ala.1960), *aff'd per curiam sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir.), *cert. denied*, 366 U.S. 913, 81 S.Ct. 430, 6 L.Ed.2d 236 (1961); *Davidson Transfer & Storage Co. v. United States*, 164 F.Supp. 571, 574 (D.Md.1958); *Texas Eastern Transmission Corp. v. Bowie Lumber Co.*, 176 So.2d 735, 737–38 (La.Ct.App.), *cert. denied*, 248 La. 385, 178 So.2d 663 (1965); *Fieger v. Glen Oaks Village, Inc.*, 309 N.Y. 527, 533–34, 132 N.E.2d 492, 494–95 (1956); 1 Moore's Federal Practice, *supra* note 12, at 1394 & n.

46, 1397. Our research disclosed no North Dakota case on point.

14. 28 U.S.C. § 1442 (1976) provides in part:
   (a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them . . . :
   (1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office . . . .

15. The State further asks this court to grant it summary judgment on the unfair competition claim, on the grounds that the confusing similarity of the names "Bank of North Dakota" and "First Bank of North Dakota" is obvious. Appellees have strenuously objected. In light of our decision on the preemption question, it is unnecessary to consider this issue.

narrower grounds and, alternatively, argue that section 30 preempts the common law of unfair competition because the two conflict.

## "Occupation of the Field"

Preliminarily we call attention to certain relevant remarks in *Hart and Wechsler's The Federal Courts and the Federal System*:

> Federal law is generally interstitial in its nature. It rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states.... [Federal legislation] builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. Congress acts, in short, against the background of the total *corpus juris* of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation.[16]

It seems reasonable to conclude that the quantum of evidence necessary to find a congressional intent to exclude state law from a given field should vary, depending on the relative generality of application of the state law to be excluded. In legislating in any given subject area, Congress is more likely to foresee, and form an intent about, potential overlap with special state laws which are directly addressed to the subject area under consideration. Possible intersections of the contemplated federal provisions and a body of general state law are more likely to be overlooked.[17] Thus, in deciding whether a particular state law lies within a field that Congress intended to occupy, a court should define the bounds of that field in terms not only of the activity regulated but also the breadth of state law which Congress meant to preempt.

In the present case, the state law allegedly preempted was the common law of unfair competition, which applies to all business enterprises within a state. While the application of unfair competition law is not so general as a state's contract law or property law, for example, it certainly is more general than a state banking code. This distinction should be kept in mind throughout the discussion of whether Congress intended to preclude the application of unfair competition law to name changes by national banks.

The district court's finding that Congress intended section 30 to be preemptive was apparently based on two considerations: first, the "comprehensiveness" of the NBA provisions establishing and regulating national banks; and second, the incorporation of state law in certain sections of the NBA and the omission of any reference to state law in section 30. In considering its first reason the court relied on *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), which stated that preemptive intent on the part of Congress may be inferred from the "pervasiveness" of the federal regulatory scheme set up by Congress or from the dominant federal interest in a field which the legislation touches. The court cited several cases that spoke of the "completeness" of the NBA as a regulatory code, the "independence" of national banks from state legisla-

16. P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's the Federal Courts and the Federal System 470–71 (2d ed. 1973).

17. *See* Hirsch, *Toward a New View of Federal Preemption*, 1972 U.Ill.L.F. 515, 543–44 (footnote omitted; emphasis added):

When Congress does focus attention on the relation of its acts to state laws dealing with the same subject matter, it looks to certain existing state laws. It is grotesquely unrealistic to suppose that Congress, in expressing a general intent to save or to preempt state laws, actively considered all possible state enactments touching the field of the federal law. Indeed Congress probably expresses such an intent without a comprehensive survey of existing state laws tangentially affecting the field of the federal law .... *Consequently when Congress expressly or implicitly indicates an intention with respect to preemption, the proper application of that intention requires an inquiry into the state laws considered by Congress as the basis for its intention.* Without an understanding of the types of state laws Congress considered in determining its policy respecting preemption, the Court cannot intelligently determine the legitimate limits within which that intent should be honored.

tion, and the status of those banks as "instrumentalities" of the federal government, subject only to the "paramount authority" of the United States, except where Congress otherwise permits. *Easton v. Iowa*, 188 U.S. 220, 229–31, 23 S.Ct. 288, 290, 47 L.Ed. 452 (1903); *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896); *Cook County Nat'l Bank v. United States*, 107 U.S. 445, 448, 2 S.Ct. 561, 564, 27 L.Ed. 537 (1883); *Farmers' & Mechanics' Nat'l Bank v. Dearing*, 91 U.S. 29, 33–34, 23 L.Ed. 196 (1875). Two of these cases, *Dearing* and *Easton*, based findings of preemption on congressional intent to exclude state legislation from the field.

In the second part of its reasoning, the district court cited several sections of the NBA that adopted state law governing state banks as the rule applicable to a resident national bank.[18] From the failure to refer to state law in section 30, the court concluded that Congress intended to preempt state regulation of name changes by national banks. For several reasons, we do not fully accept the rationale of the district court.

In general, a finding that Congress intended to preempt state regulation of a given field must be based on "an unambiguous congressional mandate to that effect." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147, 83 S.Ct. 1210, 1219, 10 L.Ed.2d 248 (1963) (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. at 230, 67 S.Ct. at 1152 ("clear and manifest purpose of Congress" is necessary)). Insofar as the district court based its inference of preemptive intent on the comprehensiveness of federal regulation under the NBA, the inference is weakened by recent Supreme Court decisions, cautioning that a detailed statutory scheme may reflect the "nature and complexity of the subject," rather than an intent to displace state law. *De Canas v. Bica*, 424 U.S. 351, 359–60, 96 S.Ct. 933, 938,

47 L.Ed.2d 43 (1976); *accord, New York State Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 414–15, 93 S.Ct. 2507, 2513–14, 37 L.Ed.2d 688 (1973). This observation seems particularly relevant in regard to the NBA.

Furthermore, the district court's holding that Congress intended to preempt state unfair competition law may be construed as going beyond the conclusion warranted by the court's reasoning. In the only two NBA cases cited by the court which actually grounded a finding of preemption on the intent of Congress, the preempted state statutes were special laws, applying only to financial institutions and transactions. In one of the cases, *Easton v. Iowa, supra*, the Court explicitly distinguished between a state's general and special criminal laws as regards their applicability to national banks. These cases do not support the conclusion that Congress intended to preempt state law of more general application, such as unfair competition law.

Similarly, the only "state law" that is incorporated in relevant sections of the NBA is state *banking* law, *i. e.*, law of special application. Congress's failure to mention state law in section 30 or in most of the other sections of the NBA may be evidence of an intent to exclude almost all state banking code provisions from the field consisting of regulation of national banks. But that does not address the issue in this case: whether Congress intended to occupy a "field" sufficiently broad to exclude as well applications of state unfair competition law. It does not seem reasonable to expect Congress, in passing an act like the NBA, to refer expressly to every state law of general application that it does not wish to preempt. Therefore, we do not infer an intent to preempt unfair competition law from Congress's failure to mention that law in section 30.

The Supreme Court has stated what we believe to be a fundamental, if not the

---

18. The sections referred to by the court were 12 U.S.C. § 36(b), (c) (power to establish and operate branch banks), *id.* § 85 (determination of interest chargeable on loans), and *id.* § 92a(a), (b), (i) (power to act as trustee or in

other fiduciary capacity). Other sections of the Act adopting state law are *id.* § 24 (Eighth) (power to make contributions to charitable institutions) and *id.* § 90 (giving of security to state upon deposit of state funds).

controlling, rule for analyzing preemption problems under the NBA:

> [N]ational banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States.

*First National Bank in St. Louis v. Missouri ex rel. Barrett*, 263 U.S. 640, 656, 44 S.Ct. 213, 215, 68 L.Ed. 486 (1924). With slight variations in wording, the Supreme Court has applied this principle over many years in various situations.[19] If the *First National Bank* rule is applicable in the present case, unfair competition law should be held preempted only if its application to name changes by national banks would "conflict" with section 30 or with the NBA as a whole in one of the specified ways.

The appellees contend that the *First National Bank* rule applies only to matters concerning a national bank's day-to-day business. They argue that such matters must be distinguished from questions relating to the circumstances under which a national bank may exercise its banking franchise. Appellees assert that questions in this second category are subject to state law only when the NBA expressly so provides. They further argue that a national

bank's decision to change the name under which it operates falls into the second category.

None of the Supreme Court cases applying the *First National Bank* rule draws this distinction, but appellees insist that the difference between the two kinds of questions was expressly recognized in *Franklin National Bank v. New York*, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954). The *Franklin* Court held preempted the application to a national bank of a state statute prohibiting the use of the word "savings" in the business or advertising of any financial institution except a state–chartered mutual savings bank or state–chartered savings and loan association. Appellees focus on the following sentence and accompanying footnote in the opinion:

> We find no indication that Congress intended to make this phase of national banking subject to local restrictions, as it has done by express language in several other instances.

*Id.* at 378, 74 S.Ct. at 554. In the footnote to this sentence, the Court listed several NBA sections adopting state law and then observed:

> Even in the absence of such express language, national banks may be subject to some state laws in the *normal course of*

---

**19.** *See Anderson National Bank v. Luckett*, 321 U.S. 233, 248, 64 S.Ct. 599, 607, 88 L.Ed. 692 (1944) (state statute providing for escheat of abandoned bank accounts was applicable to national bank); *Lewis v. Fidelity & Deposit Co.*, 292 U.S. 559, 566, 54 S.Ct. 848, 851, 78 L.Ed. 1425 (1934) (condition in surety bond, given by national bank to state on deposit of state funds, providing that bank would "faithfully perform all duties required" by state, could be complied with by bank and did not invalidate bond when "duties," as currently defined, were not contrary to NBA); *First National Bank in St. Louis, supra* (national bank was subject to state statute prohibiting branch banking) (pre–McFadden Act case); *McClellan v. Chipman*, 164 U.S. 347, 356–57, 17 S.Ct. 85, 87, 41 L.Ed. 461 (1896) (state fraudulent conveyance statute was applicable to national bank); *Davis v. Elmira Savings Bank*, 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896) (state statute giving deposits of savings banks priority in payment by insolvent national bank was preempted because of conflict with NBA

requirement of ratable distribution); *Waite v. Dowley*, 94 U.S. 527, 533, 24 L.Ed. 181 (1877) (state statute requiring cashier of resident national bank to furnish clerks of all towns where shareholders lived with annual lists of shareholders and amount paid in on their shares did not conflict with any NBA provision); *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 362, 19 L.Ed. 701 (1870) (state tax on shares of resident national bank, and collection of tax directly from bank, were valid in view of NBA provision allowing such a tax).

More recent applications of the rule have been made by the lower federal courts. *See, e. g., United Mo. Bank v. Danforth*, 394 F.Supp. 774, 785 (W.D.Mo.1975); *Brown v. United Community Nat'l Bank*, 282 F.Supp. 781, 783 (D.D.C.1968); *McKee & Co. v. First Nat'l Bank of San Diego*, 265 F.Supp. 1, 5 (S.D.Cal.1967), *aff'd per curiam*, 397 F.2d 248 (9th Cir. 1968); *South Dakota v. National Bank of S. D.*, 219 F.Supp. 842, 844–45 (D.S.D.1963), *aff'd*, 335 F.2d 444 (8th Cir. 1964), *cert. denied*, 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965).

*business* if there is no conflict with federal law. *Cf. Anderson National Bank v. Luckett*, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692; *McClellan v. Chipman*, 164 U.S. 347, 17 S.Ct. 85, 41 L.Ed. 461.

*Id.* at n.7 (emphasis added). The appellees conclude that the *Franklin* Court (1) meant to distinguish between the activity regulated by the New York law and a national bank's "normal course of business," and (2) held the state statute preempted because Congress had spoken on the subject of a national bank's power to offer and, impliedly, advertise savings accounts, and had not expressly adopted state law.

We believe appellees have misread *Franklin*. In the first place, the advertising of savings accounts clearly seems to be part of a national bank's "normal course of business," and appellees' contention that the *Franklin* Court found otherwise is highly questionable. Assuming, however, that appellees have correctly characterized the issue as one concerning the "conditions [under which] a national bank may exercise its banking franchise," the finding of preemption in *Franklin* was not based on congressional intent to preempt the field. The Court defined the issue as whether the federal and state laws conflicted, and it found preemption only because the two statutes were "incompatible." *Id.* at 374, 378, 74 S.Ct. at 553. The sentence and footnote quoted above appeared in the opinion after the Court's finding that the two laws conflicted. The Court was merely making it clear that the state statute was not saved by any express provision in the NBA.

To summarize thus far, we hold that a finding that section 30 of the NBA preempts the application of unfair competition law to name changes by national banks cannot be premised on a presumed intent of Congress to exclude all state legislation from the field.

*"Conflict"*

Our conclusion that a finding of preemption in this case cannot be based on a congressional intent to "occupy the field" by no means ends the preemption inquiry. "Even if Congress has not completely foreclosed state legislation in a particular area, a state statute is void to the extent that it actually conflicts with a valid federal statute." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). The *First National Bank* rule, discussed above, indicates that the state law in this case is void not only if the state and federal laws actually conflict, but also if the state law "interferes with the purposes for which" national banks were created or "impair[s] . . . their efficiency as federal agencies." 263 U.S. at 656, 44 S.Ct. at 215, *quoted at* p. 377 *supra.* In more general terms, "[a] conflict will be found . . . where the state 'law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Ray*, 435 U.S. at 158, 98 S.Ct. at 994 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).

The appellee banks' first argument that the state and federal laws conflict is based on the language of section 30 concerning name changes:

> Any national banking association, with the approval of the Comptroller of the Currency, may change its name . . . . A duly authenticated notice of . . . the new name . . . shall be sent to the Comptroller of the Currency; but no change of name . . . shall be valid until the Comptroller shall have issued his certificate of approval of the same.

12 U.S.C. § 30 (1976). Appellees claim that this section expressly gives them the right to use any name approved by the Comptroller and that any state law limiting that right, such as unfair competition law, conflicts with the NBA and is therefore void. This argument is unsound.

First, the argument is invalid because it assumes its own conclusion. On its face, section 30 says nothing about whether a national bank complying with the section's provisions on name changes is also subject to state unfair competition law. Appellees have the unlimited right claimed under the section only if state unfair competition law cannot be applied to them. But this condition is the very proposition to be proved.

Secondly, we believe that appellees' argument approaches the preemption issue with undue emphasis on the rights of banks. The purpose of the National Bank Act was the creation of a uniform and stable national currency. *Mercantile Bank v. New York*, 121 U.S. 138, 154, 7 S.Ct. 826, 834, 30 L.Ed. 895 (1887). As the means to this end, Congress established a system of national banks under the supervision of the Secretary of the Treasury and the Comptroller of the Currency. In furtherance of the primary purpose of the Act various provisions undertake to prescribe rules governing the formation, operation and termination of national banks and to delegate regulatory power to the Comptroller, not to confer rights on the banks.[20]

While a finding of preemption would certainly benefit the appellees as well as other national banks by providing them, in effect, a substantial immunity from state unfair competition law, this immunity would only be an "incidental benefit," not directly related to the accomplishment of the central purpose of the NBA. We would be reluctant to hold that state law should be preempted because of conflict with a merely incidental aspect of the federal regulatory scheme.[21] Thus, even if appellees could eliminate the circularity in their reasoning, in order to justify a finding of preemption on the grounds urged they would still have to show that the right claimed by them was necessary to the accomplishment of the objectives of Congress.

The appellees' second argument that section 30 conflicts with state law is based on the regulatory framework set up by the Comptroller for handling the various applications which the NBA requires to be submitted to him. In 1976 the Comptroller issued the following "policy statement" concerning name changes:

The Office of the Comptroller of the Currency (OCC) considers an application for change in corporate title to be primarily a business decision of the applicant. Such applications will be approved subject to the following limitations.

The proposed title must be sufficiently dissimilar from any other existing or proposed unaffiliated bank or depository financial institution, so as not to substantially confuse or mislead the public in a relevant market.

**20.** Several recent cases have held that the NBA provision requiring the Comptroller to conduct regular examinations of all national banks does not impose on the Comptroller an actionable duty to an examined bank or its stockholders for damages arising from negligent performance of the statutory obligation. *See Harmsen v. Smith*, 586 F.2d 156 (9th Cir. 1978); *In re Franklin Nat'l Bank Sec. Litigation (Franklin II)*, 478 F.Supp. 210, 214–16 (E.D.N.Y.1979); *In re Franklin Nat'l Bank Sec. Litigation (Franklin I)*, 445 F.Supp. 723, 730–31 (E.D.N.Y.1978); *cf. First State Bank of Hudson County v. United States*, 599 F.2d 558, 562–64 (3d Cir. 1979) (same conclusion under examination provision of Federal Deposit Insurance Act), *cert. denied*, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980). It was said that "the Comptroller's primary duty is to supervise the banking system for the protection of the public and the national economy as a whole—and not for the protection of an individual banking institution." *Franklin II*, 478 F.Supp. at 215; *accord, Franklin I*, 445 F.Supp. at 731. In *Harmsen v. Smith*, the Ninth Circuit stated:

Although bank examinations may reveal irregularities and even fraud, which discoveries may redound to the benefit of innocent persons, including stockholders, that result is merely an incidental benefit to the examined banks.

586 F.2d at 157, *quoted in Franklin II*, 478 F.Supp. at 215, *and First State Bank of Hudson County*, 599 F.2d at 563.

**21.** By referring to the "merely incidental" nature of a national bank's alleged right to change its name, we do not mean to imply that the name–change provision of section 30 differs in importance from the other provisions of the NBA. Appellees' argument is weak not because name changes were a matter of little concern to Congress, *cf. San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243, 79 S.Ct. 773, 778, 3 L.Ed.2d 775 (1959) (dictum) (state law regulating activity that is "merely peripheral concern" of federal act does not conflict with federal law), but because the conflict asserted by appellees was between state law and the right of a national bank under section 30. That "right" is simply tangential to the full achievement of the purpose of the NBA. As discussed more fully below, the appropriate inquiry is whether application of the state law will conflict with the exercise of the regulatory authority granted the Comptroller by section 30.

41 Fed.Reg. 47,964, 47,968 (1976).[22] The Comptroller has also published procedural rules, intended to facilitate "informed decisions" on applications for new charters, establishment of branches, mergers, consolidations, relocations of main offices, changes of corporate titles, and other matters. *See* 12 C.F.R. § 5.1 (1980). These rules provide for local notice of all applications, the compilation of an administrative file open to the public, the right of any interested person to submit written comments and to obtain a hearing upon request, and, if a hearing is held, the calling of witnesses, the admissibility of evidence, and the preparation of a transcript. *See id.* §§ 5.2–.14.

Appellees argue that, in this case, state unfair competition law purports to govern the same subject matter governed by the federal law and regulations thereunder (name changes by national banks), with an eye to protecting the same interest (preventing confusion and deception of the public). In such a situation, appellees contend, the state law is preempted. For this proposition, they cite several Supreme Court decisions, the most recent being *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 164–65, 98 S.Ct. 988, 997–98, 55 L.Ed.2d 179 (1978).

Apparently relying on the fact that the NBA does not expressly authorize the promulgation of rules and regulations by the

Comptroller, the State responds that the purpose of the Comptroller, as evidenced in his policy statement, cannot be substituted for the purpose of Congress, revealed only in section 30. Looking at the statutory language and the legislative history of the section, the State maintains that Congress had only two purposes in mind in enacting the name–change provision of section 30: first, to provide an orderly method for national banks to change their names; and second, to free itself from the burdensome task of approving name–change applications–a task that resulted from the failure to include a provision like section 30 in the NBA as originally enacted, twenty–two years earlier.[23] The State concludes that the purposes of section 30 and of state unfair competition law differ, that these purposes are complementary, and that no conflict results from requiring compliance with both laws by a national bank that wishes to change its name.[24]

As indicated, neither section 30 nor any general provision of the NBA expressly delegates legislative authority. Section 30 provides only that a name change by a national bank is subject to the "approval" of the Comptroller. It is established, however, that by requiring the Comptroller's "approval," Congress intended to confer dis-

---

**22.** This statement was amended in August, 1979, *see* 44 Fed.Reg. 48,169, 48,170 (1979), and the current requirements appear to be substantially more restrictive. *See* 12 C.F.R. § 4.7 (1980).

**23.** The precursor of § 30 was originally enacted as the Act of May 1, 1886, ch. 73, § 2, 24 Stat. 18. It supplemented the National Bank Act, ch. 106, 13 Stat. 99 (1864).

**24.** The parties seem to agree that one concern of unfair competition law is preventing the deception of the public through a business's use of a tradename confusingly similar to that of another business. Whether this concern reflects an independent "purpose" of unfair competition law or whether, instead, confusion of the public is merely a means of determining that an individual company's goodwill has been usurped is not made clear in the decided cases. *See* 1 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 3.4, at 91–96 (3d ed. 1967). The parties have cited only one North Dakota case dealing with unfair

competition by name infringement, *Standard Oil Co. v. Standard Oil Co. of N. D.*, 123 F.Supp. 227 (D.N.D.1954), and that case does not address the question. Therefore, it cannot be stated with certainty that one purpose of North Dakota unfair competition law is protection of the public.

Nevertheless, this uncertainty about the purpose of the state law need not impede the inquiry into whether the state and federal laws in this case conflict. Regardless of whether preventing public confusion is a separate purpose of unfair competition law, it is clear that public confusion is an essential element of an unfair competition suit for name infringement. *See* 18 Am.Jur.2d *Corporations* § 146 (1965); 74 *id. Trademarks and Tradenames* § 110 (1974). By adopting "substantial confusion of the public" as his test for ruling on name–change requests, the Comptroller has made it inevitable that his standards will overlap with those applied by a court in an unfair competition suit attacking the same name change.

cretionary authority on the Comptroller.[25] *See, e. g., First National Bank of Smithfield v. Saxon*, 352 F.2d 267, 272 (4th Cir. 1965); *cf. Federal Home Loan Bank Board v. Rowe*, 284 F.2d 274, 278 (D.C.Cir.1960) (conferral of discretion on Federal Home Loan Bank Board); *Apfel v. Mellon*, 33 F.2d 805, 806–07 (D.C.Cir.) (conferral of discretion on Federal Reserve Board), *cert. denied*, 280 U.S. 585, 50 S.Ct. 35, 74 L.Ed. 634 (1929). Certainly the Comptroller has implied authority "to state publicly the manner in which he will exercise [this discretionary power], and any such public statement can be adopted through a rule–making procedure," although Congress has not "separately conferred a rule–making power on" the Comptroller. K. Davis, Discretionary Justice 78 (1969). *See also* K. Davis, Administrative Law Treatise § 5.03, at 147 (Supp. 1976). This proposition, however, falls short of the conclusion that Congress intended to delegate preemptive law-making power to the Comptroller, and we are reluctant to hold that a finding of preemption in

this case can be based solely upon the Comptroller's policy statement.

What we have just said makes it clear that if the application of state unfair competition law to name changes by national banks is preempted, it must be because of conflict between that law and the regulatory authority under section 30 itself. The State's analysis of the reason for the adoption of section 30 and the purpose of the section has been discussed above and seems to be essentially correct, as far as it goes. The problem is that it does not go far enough. An immediate purpose of the Forty–Ninth Congress, which enacted the original version of section 30, was, as the State contends, the removal from Congress's shoulders of the burden of enacting a private law whenever a national bank wished to change its name.[26] At this stage of our inquiry, however, we are not only concerned with the intent of Congress, but also with the modus operandi of the scheme estab-

---

**25.** In *Apfel v. Mellon*, 33 F.2d 805, 806–07 (D.C. Cir.), *cert. denied*, 280 U.S. 585, 50 S.Ct. 35, 74 L.Ed. 634 (1929), the court stated:

> The word "approved" naturally imports the exercise of judgment and discretion; and the power to approve ordinarily implies a power to disapprove.
>
> .    .    .    .    .
>
> An examination of congressional legislation with regard to banking since 1864 shows that Congress has consistently used various forms of the word "approve" in the sense of conferring discretion upon the Comptroller of the Currency, the Secretary of the Treasury, or the Federal Reserve Board.

The State has cited two cases holding that section 30 does not preempt state unfair competition law as applied to name changes of national banks. *First Nat'l Bank of Lander v. First Wyoming Sav. & Loan Ass'n*, 592 P.2d 697 (Wyo.1979); *Middletown Trust Co. v. Middletown Nat'l Bank*, 110 Conn. 13, 147 A. 22 (1929). Both of these cases drew an analogy between the Comptroller's approval of a new name under section 30 and a state officer's approval of a new corporation's name, the latter of which decisions has been held not to immunize the corporation from liability for unfair competition through name infringement. The reason for this rule is that the state officer's approval is an ex parte, ministerial act, with no opportunity for the presentation of opposing views. Because we find that section 30 is a grant of discretionary authority, calling

for an exercise of judgment, the decision of the Comptroller is clearly distinguishable from that of a state officer. We therefore decline to follow the two cited cases.

**26.** The meager legislative history of the name–change provision consists of a one-page report of the House Committee on Banking and Currency and brief comments in the floor debates in the House and the Senate. *See* 17 Cong.Rec. 1349–52 (1886) (House debate); *id.* at 1721–23 (Senate debate). The name–change provision was combined with provisions giving the Comptroller approval power over relocations and increases in the capital of national banks. Most of the floor debates pertained to the latter provisions. The second paragraph of the House Report reflects the dominant concern:

> Numerous private bills have been introduced into the last and into the present Congress to change the names or locations of individual banks, or to increase their capital stock beyond the limits originally fixed in their articles of association. Each of these private bills occupies the time and burdens the calendars of committees and of the House. There is no reason why applications for such changes by individual banks should not be disposed of by the Comptroller of the Currency under conditions established by law.

H.R.Rep. No. 104, 49th Cong., 1st Sess. (1886), *reprinted in* 17 Cong.Rec. 1350 (1886).

lished by Congress, and whether the state law would interfere with the functioning of that scheme.

■ The possible reasons for Congress's requiring all name changes to be approved by the Comptroller, and the considerations which Congress may have expected the Comptroller to take into account in his decision–making, seem to be few. But the obvious reason for requiring *approval* of a name change is that Congress expected the Comptroller to compare a proposed name with those of other banks in the same area and decide whether the new name would be either identical to that of another bank or so similar that confusion would result. Such an inquiry seems to be the reasonably expectable result of authorizing a person to approve or disapprove name changes, while not providing any criterion for decision. Thus we hold that, in enacting section 30, Congress expected and implicitly authorized the Comptroller to compare the proposed name with the names of other nearby banks and to make his decision accordingly.

It is clear that this comparison will be very similar, if not identical, to the standard employed by a court in deciding a claim against a national bank for unfair competition by name infringement.[27] If the Comptroller approved a bank's change of name, but a court found the bank liable in an unfair competition suit, the difference in results could only be explained as inconsistent applications of the same standard. The court judgment could, in effect, nullify the Comptroller's discretionary determination under section 30. If state unfair competition law is allowed to apply to name changes by national banks, such conflicts will be inevitable, not a mere possibility. *See Goldstein v. California,* 412 U.S. 546, 554–55, 93 S.Ct. 2303, 2308–09, 37 L.Ed.2d 163 (1973). As the Supreme Court observed in a slightly different context,

[a] multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.

*Garner v. Teamsters Local 776,* 346 U.S. 485, 490–91, 74 S.Ct. 161, 166, 98 L.Ed. 228 (1953). We therefore hold that state unfair competition law, insofar as applied to Comptroller–approved name changes by national banks, is preempted because of conflict with section 30 of the NBA.

One final word should be added about the scope of our holding. The Supreme Court has noted that state law which is preempted solely because of conflict with federal law should be invalidated "only to the extent necessary to protect the achievement of the aims of the" federal act. *Silver v. New York Stock Exchange,* 373 U.S. 341, 361, 83 S.Ct. 1246, 1259, 10 L.Ed.2d 389 (1963), *quoted in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware,* 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973), *and De Canas v. Bica,* 424 U.S. 351, 357–58 n.5, 96 S.Ct. 933, 937 n.5, 47 L.Ed.2d 43 (1976). Our holding is based on, and is intended to prevent, the inevitable conflict between the decisions of the Comptroller under section 30 and the judgments of courts applying unfair competition law to the same names. Thus, if a national bank uses a name that has *not* been approved by the Comptroller, the reason for our holding would not be implicated and the bank would be subject to any applicable provision of state unfair competition law.[28]

■ Similarly, the Comptroller's approval under section 30, and therefore our holding of preemption, extends only to the new name chosen by a national bank, and not to all of the contexts in which that name may be used. If the bank incorporates its new name in a deceptive, confusing, or misleading logo, letterhead, advertisement, or the

---

27. *See* note 24 *supra.*

28. This may be the situation in one of the companion cases hereto, *First National Bank of*

*Aberdeen v. Aberdeen National Bank,* 627 F.2d 843 (8th Cir. 1980). The plaintiff there has alleged that the defendant used names other

like, the bank may be subject to liability under state unfair competition law.[29]

From what has been said it follows that the judgment of dismissal of the State's complaint should be without prejudice to assertion in an appropriate forum of any claim of unfair competition based on factors other than inherently deceptive similarity of defendants' new names to that of appellant.

So modified, the judgment of the district court is affirmed.

than the one approved by the Comptroller. *See id.,* at 845 n.3.

29. While no such issue was argued here, the plaintiff in *First National Bank of Aberdeen, supra,* has also alleged that the defendant, after gaining the Comptroller's approval of its new name, used the new name in signs and advertisements that were deceptively similar to plaintiff's. *See id.*

Some of the factors that may prove determinative in an unfair competition suit against a national bank that uses its new name in a deceptive format were illustrated in *Liberty Mutual Ins. Co. v. Liberty Ins. Co. of Texas,* 185 F.Supp. 895 (E.D.Ark.1960). In that case, the defendant had used a logo composed of its corporate name, which was somewhat similar to plaintiff's name, and its service mark–a statue of liberty–which was nearly the same as plaintiff's. In the logo, the words in defendant's name were set in the same style of type used by plaintiff, the words were arranged in the same positions as in plaintiff's logo, and the service mark appeared in the same position relative to the words. The court held that, although the full names of plaintiff and defendant were not deceptively similar, defendant was nevertheless liable for trademark infringement and unfair competition because the "overall format" of its logo was deceptively similar to that of plaintiff.